*593 OPINION.
Littleton:
The issues involved in this appeal are: (1) The amount which the taxpayer may include in invested capital as the actual cash value of property paid in for stock on January 27, 1914, and (2) whether the interest-bearing demand promissory notes paid in for $48,000 of stock of the Volunteer Coal Co. should have been included in invested capital from the date paid in until, the dissolution of the corporation.
Prior to January 1, 1914, the Knoxville Iron Co. was the owner of the Cross Mountain Coal Mine, but, owing to a disastrous explosion therein during the year 1911, the officers and stockholders of the Knoxville Iron Co. decided to segregate the two branches of its business in order that the milling part of the business might not again-be jeopardized by the possible recurrence of an explosion in the coal mine. The transfer of the property from the Knoxville Iron Co. to the taxpayer corporation was effected through the medium of E. D. Attix, who purchased the property from the Knoxville Iron Co. for $75,000 and immediately thereafter transferred this same property to taxpayer corporation for the entire amount of its $200,000 capital stock.
Under section 207 (a) (2) of the Revenue Act of 1917, invested capital, so far as this appeal is concerned, is the actual cash value of tangible property paid in other than cash for stock or shares in such corporation or partnership, at the time of such payment. The 1918 Act and the 1921 Act, regarding invested capital as affecting this appeal, contain substantially the same provisions as section 207 of the 1917 Act.
It is, therefore, necessary for the taxpayer to establish the actual cash value of the property acquired as of January 1, 1914, in order to substantiate its claim for invested capital and paid-in surplus.
*594 The evidence in this appeal shows that prior to the organization of the taxpayer the .Knoxville Iron Co. had operated the property as a part of its business. In 1903.there was a disastrous explosion in the mine of another company adjoining that of the Knoxville Iron Co. Early in 1904 the Knoxville Iron Co. was considering the feasibility of separating its business into two corporations. In 1911 an explosion occurred in its mine in which 96 men were killed and many others injured. Soon after this explosion the stockholders of the Knoxville Iron Co. directed the company’s attorney to take the necessary legal steps to effect a separation of the coal and milling interests in order that the milling part of the business should not be held liable in the event of another explosion in the mines. It was not the intention of the directors of the Knoxville Iron Co. that the mining properties should pass into the hands of outside interests. In effecting the sale they guarded against such a possibility, the plan being that substantially the same stockholders should own and. operate the two companies, but under separate charters. The plan finally devised was to advertise the mining interests for sale, reserving, however, the right to reject any and all bids. E. D. Attix, trustee, acting as a medium, submitted the only bid. His proposal stated that the stock in the new company should be offered to the stockholders of the Knoxville Iron Co. proportionately to their holdings in that company. Approximately 75 per cent of the stockholders of the iron company subscribed; the remaining 25 per cent, fearing another explosion in the mine, did not subscribe and did not become stockholders in the new company. The amount of $75,000 paid by Attix to the Knoxville Iron Co. for the mining properties was not considered as representing the true value of the property. The evidence shows that the directors of the Knoxville Iron Co. did not consider the price offered by Attix as material, since the property would not pass from the control of the stockholders of the Knoxville Iron Co.
At the time the property was acquired by the taxpayer a physical inventory was taken which showed a value of approximately $300,000. The mine was completely developed with only 16.2 per cent of the recoverable tonnage removed, leaving the recoverable tonnage on January 1, 1914, at 8,046,605 tons. The valuation of the properties acquired by the taxpayer for $200,000 of capital stock was made by a mining engineer thoroughly familiar with the coal lands in that territory and who for several years had been engaged in operating and superintending mines. In addition to this evidence, George H. Camp, for more than 30 years actively engaged in the development and operation of coal mines, who for many years has operated a coal mine adjoining that of the taxpayer, and who was thoroughly familiar with the taxpayer’s property as well as with the *595 value of mine properties generally in that territory, gave as his opinion that the fair cash value of the taxpayer’s property from an investment standpoint, taking into consideration the marketing of the coal, its quality, and the cheapness of operating the seam, was §250,000, and that this amount would be a fair value for a purchaser to pay. Mr. Camp is a competitor of the taxpayer and has no interest in the business of the taxpayer or that of the Knoxville Iron Co.
The transfer of the property from the Knoxville Iron Co. to the taxpayer was an intracompany transaction and the sale to E. D. Attix, trustee, was only a means of transferring the coal properties to a separate corporation to be owned by the same interests which owned the property before it was transferred.
From all of the evidence submitted, the Board is of the opinion that the property paid in for the stock of the taxpayer on January 27, 1914, had an actual cash value on January 1, 1914, and on the date paid in, of $250,000, and that the taxpayer is, therefore, entitled to a paid-in surplus in respect of this property in computing invested capital for the years involved of $50,000.
The second question is whether the interest-bearing demand promissory notes, amounting to $48,000, paid in on October 23, 1917, for stock of the Volunteer Coal Co. should have been included in invested capital. In 1917, owing to the Government war regulations, it became difficult for the taxpayer to secure sufficient cars to remove its coal. Its officers formulated the plan of organizing a new coal company, known as the Volunteer Coal Co., hoping by this means to secure a greater supply of coal cars. This company wa.s incorporated at $100,000. It accepted as part payment for stock $48,000 in demand interest-bearing notes of the following persons:
E. D. Attix_$2,208
Anna XJpjolm_ 480
W. R. Stephenson_ 624
E. W. Ogden_ 768
F. O. Ogden_ 768
Minnie O. Ewing_ 1,200
R. A. Clifford_ 480
L. O. Clifford_ 480
M. Chamberlain_ 1,200
H. S. Chamberlain, jr_-_ 1,200
Estate of H. S. Chamberlain_13,488
P. F. Lynch_ 624
S. C. Hoskins_ $480
Mrs. W. P. Davis- 1, 920
W. P. Davis_ 1,920
H. W. Van Benschoten_ 2,400
O. A. Brown_ 1,104
W. H. Van Benschoten_12,336
Lizzie Van Benschoten_ 720’
A. K. Van Benschoten_ 960
Ethel Van Benschoten_ 1,440
W. A. Van Benschoten_ 1,200
48,000
These notes were all payable on demand and bore interest at the rate of 6 per cent. The notes were taken instead of cash for the reason that it was not definitely known how much money would be required to develop the mine, such development depending largely upon the ability to secure coal cars. The plan was to demand payment on the notes from time to time in such amounts as were needed *596 to operate the mine. Each, of the makers of the notes was entirely solvent and responsible and fully able at all times to pay the amo'unt of his respective note upon demand. The notes were bona -fide paid in for stock and the actual cash value thereof was equal to their face value. In 1918, after repeated trials, the taxpayer found that additional cars could not, be procured, inasmuch as the car supply was based upon prior production of the mine. The object for which the-Volunteer Coal Co. was organized having failed, it surrendered its charter, canceled the notes, and returned the remainder of its property tq the taxpayer.
In computing the invested capital of the taxpayer these notes, paid into its subsidiary for the latter’s capital stock, should have been included therein at their face value from the date paid in. Appeal of Hewitt Rubber Co., 1 B. T. A. 424; Appeal of American Steel Co., 1 B. T. A. 839.
Aeukdell not participating.